**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| ANADARKO US OFFSHORE LLC and ANADARKO PETROLEUM CORPORATION, | § | |
| *Plaintiffs,* | § | Case No. __________ |
| v. | § | **COMPLAINT** |
| W&T ENERGY VI, LLC, | § | |
| *Defendant,* | § | |

Plaintiffs Anadarko US Offshore LLC ("AUSO") and Anadarko Petroleum Corporation ("APC") (collectively, "Anadarko" or "Plaintiffs") file this Original Complaint against Defendant W&T Energy VI, LLC ("W&T" or "Defendant") asserting a claim for declaratory relief under 28 U.S.C. § 2201, and allege as follows:

## I. PRELIMINARY STATEMENT

1. This is an action for declaratory relief arising from W&T's waiver of arbitration under its Joint Operating Agreement ("JOA") with Anadarko for the exploration, development and production of hydrocarbons from offshore oil and gas leases.

2. W&T dragged Anadarko into this Court in November 2024, bringing merits claims for breach of contract and breach of duty of good faith, seeking money damages and demanding an injunction that would have required APC to make a government filing with which Anadarko did not agree. W&T claimed APC was "required to file" it.

3. When the Court correctly denied the injunction, W&T—forgetting what it had told the Court days earlier—just made the government filing itself. After a technical team meeting between the parties on January 30, 2025, W&T finally non-suited its claims in this Court and sent

a Notice of Intention to Arbitrate, vaguely asserting that Anadarko breached the JOA and that "the JOA has terminated."

4. This Court, not arbitration, is the appropriate forum for the resolution of the parties' disputes. While the JOA contains an arbitration provision, W&T waived that provision when it substantially invoked the judicial process by requesting this Court to resolve the merits of this dispute. W&T cannot sue on the merits seeking complete relief from the Court and then change course after an adverse ruling on its TRO application. Therefore, Anadarko seeks a declaratory judgment that, by substantially invoking the judicial process in its November 2024 lawsuit in this Court, W&T waived arbitration.

## II. PARTIES

5. Plaintiff Anadarko US Offshore LLC is a limited liability company organized and existing under the laws of Delaware with its headquarters and principal business address at 1201 Lake Robbins Drive, The Woodlands, Texas, 77380.

6. Plaintiff Anadarko Petroleum Corporation is a corporation organized and existing under the laws of Delaware with its headquarters and principal business address at 1201 Lake Robbins Drive, The Woodlands, Texas, 77380.

7. Defendant W&T Energy VI, LLC is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business listed in SEC filings as 8 Greenway Plaza, Ste. 1330, Houston, Texas 77046. In certain communications with Plaintiffs, W&T Energy VI, LLC has listed its address as 5718 Westheimer Rd., Suite 700, Houston, Texas 77057.

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331. The Court has jurisdiction to hear these claims under the Outer Continental Shelf Lands Act

("OCSLA"), which provides federal court jurisdiction over cases and controversies arising out of or in connection with any operation conducted on the Outer Continental Shelf that involves exploration, development, or production of minerals. 43 U.S.C. § 1331. The Power Play well that is the subject of the parties' dispute is located on the Outer Continental Shelf. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose. 43 U.S.C. § 1349(b).

9. This Court has personal jurisdiction over Defendant, who is generally "at home" for due process purposes in Texas and has its principal place of business in this State. W&T conducts extensive operations and business within Texas, and it previously filed and appeared in litigation in this Court concerning the same contract and transactions at issue in this dispute. Additionally, this dispute arises specifically out of a contract between Plaintiffs and Defendant that was executed and performable in Texas, under Texas law. Defendant entered into and has partially performed the contract in Texas and in this District. As such, Defendant has purposefully conducted business in this State and took advantage of this State's laws.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and is a resident of the State in which the District is located, and a substantial part of the events giving rise to the claims occurred in this District. Additionally, venue of this case is proper pursuant to 43 U.S.C. § 1349(b)(1) because Defendant resides or may be found in this District or the District is nearest to the place the cause of action arose.

## IV. FACTUAL BACKGROUND

### A. The Joint Operating Agreement and the Power Play Well.

11. Kerr-McGee Oil & Gas Corporation, Newfield Exploration Company and Woodside Energy (USA) Inc entered the JOA effective as of May 1, 2006. The JOA originally

governed federal oil and gas Leases OCS-G 27632 and OCS-G 24479 covering Garden Banks Blocks 258 and 302, respectively, on the Outer Continental Shelf, from the surface to the stratigraphic equivalent of the top of salt or 24,000 feet, whichever is lesser. Lease OCS-G 24479 terminated in 2016 at which point the contract area under the JOA was reduced to Lease OCS-G 27632 (the "Lease") covering Garden Banks Block 258 from the surface to the stratigraphic equivalent of the top of salt or a depth of 24,000 feet, whichever is lesser (the "Contract Area").

12. In the years following, via acquisitions and corporate successions, AUSO and W&T came to co-own the "Power Play" well within the Contract Area covered by the JOA. Power Play was originally drilled in 2006, and APC was designated Operator for the relevant portion of the Lease in 2009. W&T's affiliate and predecessor in interest, W&T Offshore, Inc., first acquired an interest in the well in 2012. At all times relevant to this dispute, the ownership interests for the Power Play well were held as follows:

- Anadarko US Offshore LLC: 56.25%
- W&T Energy VI, LLC: 43.75%

**B. APC Discovers Potential Leaks That Require the Well to Be Shut In and Works Closely With W&T to Share Its Investigation and Findings.**

13. In November 2023, APC discovered possible hydrocarbon leakage from the Power Play well's subsurface safety valve control lines. In response, APC acted promptly to shut the well in on November 7, 2023. The shut-in of the well triggered a one-year period to return the well to production; otherwise, the Lease would terminate on November 6, 2024.

14. APC conducted further investigation and testing and confirmed that the leak consisted of produced hydrocarbons. Anadarko promptly notified W&T of the leak and that the well would continue to be shut-in to prevent further leakage. Anadarko hosted a meeting with

W&T in December 2023 to provide detailed information as to its ongoing investigations and potential paths forward.

15. In January 2024, although the well was still shut-in, the well's subsea control module ("SCM") failed, leaving APC unable to monitor the well's casing pressure. In response to a March 2024 order from the federal regulator—the Bureau of Safety and Environmental Enforcement ("BSEE")—APC replaced the SCM on the well to reestablish communications.

16. On March 26, 2024, Anadarko hosted another meeting with W&T to provide a detailed report of the well leak investigations, communications loss, and BSEE-ordered SCM replacement. APC explained that, after its investigation and consultation with its subsea parts manufacturers, it had determined that there was no safe way to economically return the well to production, and therefore did not see any alternative but to plug and abandon the well. The leaks were the result of an equipment failure, not any fault of Anadarko.

17. In correspondence after the March meeting, W&T made extensive and overly burdensome information requests, purportedly to allow it to evaluate APC's plan for plugging and abandonment. While APC—at that time—declined to undertake the extraordinary burden of responding to each of W&T's demands, it worked closely with W&T to provide the information that W&T claimed it truly needed. The parties' back-and-forth culminated in a June 12, 2024 meeting with W&T personnel where APC provided a detailed technical update, responded extensively to W&T's questions, and laid out a proposal for plugging and abandonment.

18. Despite receiving extensive information—which demonstrated that the well could not economically be brought back into production consistent with safety and environmental regulations—on July 1, 2024 W&T objected to APC's Authorization for Expenditure ("AFE") associated with abandonment of the well's pipelines and umbilicals. Nonetheless, W&T then

turned around and submitted its own competing proposal on October 7, 2024 to carry out not only the same pipeline and umbilical operations, but ***all*** abandonment operations associated with the well. One way or another, all parties appeared to agree on October 7, 2024 that the well needed to be plugged and abandoned.

19. Eight days later, W&T changed its mind. On October 15, it submitted an "alternative" proposal to rework the well and ostensibly return it to production, and it followed up with further documentation of that proposal on October 17. On October 28, W&T—for the first time—submitted a proposed Suspension of Production ("SOP") letter and demanded that APC send the letter to BSEE to seek the agency's approval to extend the Lease beyond its November 6, 2024 end date, pending completion of W&T's October 15 rework proposal. These proposals were too little, too late. Under the JOA, AUSO is entitled to a 30-day period to evaluate such proposals, and it had no obligation to respond to W&T's belated demands prior to the Lease's November 6 termination.

20. More important, W&T's rework proposal was unrealistic because it would not have economically brought the well back into operation consistent with safety and environmental standards. Among other problems, the proposal involved retreading multiple steps already taken by APC in its November 2023 diagnostic investigation.

21. And W&T's draft SOP (to be submitted ***with APC's signature***) contained multiple statements that Anadarko fundamentally disagreed with. For instance, it wrongly suggested that only one of the safety valve control lines had a leak (both did), and that there was a realistic path to return the well to production in paying quantities (there was not). Anadarko therefore rejected W&T's demand that APC submit the SOP.

**B. W&T Files an Action for Injunctive Relief in This Court in Attempt to Force APC to File the SOP Against Its Will.**

22. On November 1, 2024, W&T filed claims against Anadarko in this Court for breach of contract, breach of duty of good faith, and declaratory relief, arising from Anadarko's refusal to file W&T's proposed SOP. The Complaint sought complete merits relief for those claims in the form of money damages and injunctive relief. The filing also included an emergency application for temporary restraining order, preliminary injunction, and permanent injunction against Anadarko, asking the Court to *force* APC to file W&T's proposed SOP before the November 6 termination of the Lease, despite Anadarko's disagreement with its substance. *See W&T Energy VI, LLC v. Anadarko US Offshore LLC*, No. 3:24-CV-319, 2024 WL 4681616 (S.D. Tex. Nov. 5, 2024). Notably, W&T's lawsuit and its emergency request for injunctive relief (which dragged Anadarko into Court just four days later) were premised on W&T's assertion that "[b]ecause Anadarko is the designated Operator for the Well under the JOA, ***Anadarko is required to file the [SOP]*** with the BSEE."

23. The Complaint made no mention of the JOA's arbitration clause whatsoever, nor did it attempt to preserve W&T's right to arbitrate the dispute.

24. After hearing oral argument, the Court denied W&T's TRO and injunctive relief in full. Because Anadarko disagreed with the substantive statements in W&T's proposed SOP, the Court found that "compelling Anadarko to make representations to the BSEE that Anadarko otherwise disagrees with would amount to [improper] compelled speech." *Id.* at *1. W&T further failed to establish that it would suffer irreparable harm without injunctive relief. *Id.* at *2.

25. At no point in the prior lawsuit did W&T make mention of arbitration or ask the Court to confine any relief to an injunction in aid of arbitration.

**C. With Its Injunction Denied, W&T Reverses Course and Files Its SOP Anyway, and Then Holds the SOP Documentation Hostage.**

26. One day after the issuance of this Court's Order denying injunctive relief, W&T reversed course again, abandoning the entire theory upon which its lawsuit was based. ***W&T filed the proposed SOP itself*** on November 6, without Anadarko's knowledge. This, of course, directly conflicted with what W&T had represented to the Court just five days earlier—that ***APC*** was "required to file" the SOP.

27. W&T followed that filing up with a letter to Anadarko on November 8, making new demands for information. W&T demanded that Anadarko broadly provide "detailed Well and subsea infrastructure information" and cease its efforts to plug and abandon the well. W&T attached a portion of its communications with BSEE and stated that BSEE had requested additional information from W&T, but W&T did not provide Anadarko a copy of its original November 6 SOP letter, nor of BSEE's Request for Information ("RFI"). W&T claimed—incorrectly—that it had become "Substitute Operator" of the well for the operations it proposed in its SOP.

28. On November 14, APC received word from BSEE about an entirely separate issue. BSEE ordered that the well be shut-in due to a casing pressure issue under 30 C.F.R. § 250.519, and it required APC to commence corrective action within 90 days. Anadarko evaluated whether there was an economically viable way to fix the new casing pressure issue, which was a separate question from the safety valve control lines. In other words, even if W&T's SOP proposal to repair the safety valve control lines was successful, that would not resolve the casing pressure issue targeted by BSEE's separate November 14 order, and vice versa. APC determined that performing a "downhole sleeve shift" operation would fix the casing pressure issue and notified W&T of its plans to pursue that remedy.

29. By letter on November 14, Anadarko agreed to provide W&T with any relevant information requested by BSEE as part of its SOP process, along with any other information that APC was required to provide to a non-operator like W&T under the JOA. But it reiterated that it would need copies of the SOP and BSEE's RFI so as to understand what information the agency required, and it asked to be included in future communications with BSEE.

30. Again on November 19, ignoring Anadarko's requests for the SOP and RFI altogether, W&T demanded that Anadarko provide it with "detailed Well and subsea infrastructure information." No further specifics or explanation. Anadarko responded on December 6, explaining that W&T had not provided sufficient information for Anadarko to even begin to evaluate its data request. Anadarko reminded W&T that it had already provided certain information during the summer of 2024, but that W&T had not explained what additional documents were outstanding. Anadarko reiterated its request for the SOP and RFI, and it requested that W&T correct the representation it had made to BSEE that W&T was Substitute Operator for the proposed operation.

31. On December 10, W&T finally provided an itemized list of the documents it was requesting. But again, it continued to delay, ignoring Anadarko's request for the SOP and RFI documentation entirely. Anadarko responded on December 12 that it was gathering W&T's requested documents and once again reiterated its request for the SOP and RFI. In another letter on December 12, W&T doubled down on its claim that it was Substitute Operator—not just for the SOP operation regarding the safety valves, but *also in regard to the parallel casing pressure* issue. This, too, was wrong. Anadarko again requested the SOP and RFI.

32. On December 17, BSEE approved APC's downhole sleeve shift proposal to address the casing pressure issue. Anadarko emailed W&T on December 19, forwarding BSEE's approval and explaining that as Operator, APC would complete the sleeve shift within 90 days as required

by BSEE. Anadarko further explained that—despite W&T's refusal to share its SOP or BSEE's RFI—it had gathered the majority of W&T's requested documents, but it would not transmit them until W&T confirmed that it would promptly produce the SOP communications, which it had wrongfully withheld without any explanation.

33. Finally, on January 7, 2025, W&T confirmed that it would send the SOP communications after receiving Anadarko's documents. Based on that agreement, Anadarko transmitted the requested documents shortly thereafter, to the extent they were reasonably available. But W&T promptly reneged. After receiving Anadarko's documents, it refused to send the SOP and RFI. Instead, it raised new purported deficiencies with Anadarko's documents—claiming, for example, that Anadarko must provide W&T with documents that are not readily available, and, for the first time, that it must provide various documents in a particular file format. Delaying further, W&T now claimed that it would only provide the SOP documentation at an upcoming meeting of the parties' technical teams, and then only if Anadarko acceded to its unreasonable demands. Anadarko refused to indulge W&T's attempts to hold the SOP materials hostage and cancelled the meeting.

34. W&T finally sent the SOP and RFI documentation on January 16, and the parties held a technical team meeting on January 30, 2025. At the meeting, the parties discussed W&T's document requests, the safety valve control line issues and the status of Anadarko's preparations to decommission the well, and the casing pressure data and the status of the sleeve shift operation, among other things.

**D. W&T Dismisses Its Claims and Attempts to Initiate Arbitration.**

35. W&T voluntarily dismissed its lawsuit in this Court on February 6. On the same day, it sent Anadarko a Notice of Intention to Arbitrate ("Notice"), purporting to invoke Exhibit

H of the JOA. Of course, this Notice came after W&T had already substantially invoked the judicial process in its November 2024 lawsuit in this Court, wherein it asserted full-fledged merits claims for breach of contract, breach of duty of good faith, and declaratory relief, asserted monetary damages, and appeared in person to argue its application for a TRO and injunctive relief.

36. As set forth above, W&T did not reserve its rights to arbitrate its claims anywhere in its November 2024 Complaint, nor in any other related filings in this Court or communications to Anadarko.

37. In the Notice, W&T finally conceded what Anadarko had believed and represented from the beginning: that the Power Play well cannot be returned to production and must be plugged and abandoned. W&T also claimed that the information provided by Anadarko at the January 30, 2025 technical team meeting revealed that Anadarko had "materially breached the JOA in its operation of the Well." W&T did not explain what "information" it was referring to, or what Anadarko's purported "breach" was, but it stated that it would "request a determination that the JOA has terminated as a result of Anadarko's material breach."

38. W&T's arbitration demand is nothing more than the latest of W&T's string of gambits to defer or avoid its unambiguous payment obligations under the JOA. Anadarko files this lawsuit to vindicate its right to litigate W&T's claims in this Court—where W&T has already filed and litigated them, thereby waiving arbitration.

## V. COUNT I: DECLARATORY JUDGMENT

39. Anadarko repeats and realleges the allegations in paragraphs 1-38 above, as if fully set forth herein.

40. There is an actual and justiciable controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202. The parties dispute whether W&T waived arbitration.

41. W&T filed a November 2024 lawsuit against Anadarko in this Court which asserted merits claims for breach of contract, breach of duty of good faith, and declaratory relief regarding Anadarko's refusal to submit W&T's proposed SOP to BSEE, and it requested monetary damages, all arising from the parties' dealings under the JOA. W&T also requested injunctive relief and appeared in Court to argue such motion, which was swiftly denied. W&T never once preserved its right to arbitrate any claims arising from the dispute over the SOP, the expiration of the lease, the JOA, and/or the decommissioning of the Power Play well, either in its filings or in open court.

42. W&T thereby clearly and unequivocally evinced its desire to resolve its claims through litigation rather than arbitration, and it therefore substantially invoked the judicial process.

43. Not happy with the Court's denial of its TRO and request for injunction, W&T now seeks a different forum. W&T nonsuited its claims in this Court and attempted to initiate arbitration proceedings on February 6, 2025.

44. This dispute is properly addressed in a declaratory judgment action because a declaratory judgment will clarify the arbitrability of this dispute and afford relief from the uncertainty and controversy occasioned by W&T's Notice of Intention to Arbitrate. A judicial declaration is necessary and appropriate so that the parties to this action may ascertain their rights and duties under the JOA. Whether W&T's litigation conduct waived its right to arbitrate is a matter for this Court to decide, not a matter for an arbitrator. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd.*, 999 F.3d 257, 263–64 (5th Cir. 2021).

45. Anadarko is entitled to a declaratory judgment that W&T has waived arbitration. Absent such a declaration, W&T will continue to wrongfully attempt to arbitrate its claims, which will cause unnecessary expenses to the parties, needlessly tax the Court and arbitrators with parallel proceedings, and pose a risk of inconsistent judgments.

## PRAYER FOR RELIEF

**WHEREFORE,** on final trial, Plaintiffs request that the Court issue a declaratory judgment that W&T has waived arbitration and award Plaintiffs all other relief, in law or equity, as to which Plaintiffs may be entitled.

Dated: March 7, 2025

Respectfully Submitted,

**GIBBS & BRUNS LLP**

By: /s/ *Sam W. Cruse*
Sam W. Cruse
Federal ID: 617834
State Bar No. 24036423
scruse@gibbsbruns.com
*Attorney-in-charge*
Justin D. Patrick
Federal ID: 3135281
State Bar No. 24098229
jpatrick@gibbsbruns.com
Peter J. McDonald
Federal ID: 3687674
State Bar No. 24116738
pmcdonald@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713)650-8805
Facsimile: (713)750-0903

**ATTORNEYS FOR PLAINTIFFS**